S98A1993, S98X1995. TURPIN v. BENNETT; and vice versa.
(513 SE2d 478)

THOMPSON, Justice.

This habeas corpus case presents an issue of first impression in this state: Does a defendant have a right to effective assistance of an expert witness which is distinct from his right to effective assistance of counsel? We answer this question in the negative. We hasten to add, however, that the adequacy of an expert's assistance can be examined within the context of an ineffective assistance of counsel claim.

Jack Bennett was convicted of murdering his wife and sentenced to death. This Court affirmed Bennett's conviction and death sentence, *Bennett v. State,* 262 Ga. 149 (414 SE2d 218) (1992), and the United States Supreme Court denied Bennett's petition for certiorari. *Bennett v. Georgia,* 506 U. S. 957 (113 SC 416, 121 LE2d 340) (1992).

Bennett and the victim had been married for only four days when, as the victim slept, Bennett took a knife, stabbed her more than 100 times, and crushed her skull with a hammer. The State theorized that Bennett killed his wife in a jealous rage.

Until the time of the murder, Bennett, who was 62 years old, led a peaceful life. The father of four daughters, he was gainfully employed at a job which he held for twenty years, and had no record of crime or violence.

Bennett turned himself in to the police and freely admitted that he killed his wife. He claimed that his wife and another had been plotting to kill him and that he killed her in self-defense. Based on that claim and Bennett's apparent instability, trial counsel Kenneth

Krontz and Jennifer McLeod, who had been retained by Bennett, came to the conclusion that they needed a psychiatrist to explore an insanity defense.

In a previous case calling for psychiatric assistance, trial counsel used Dr. Boaz Harris. They were impressed by Dr. Harris, who was a graduate of Yale University School of Medicine and the founder of Charter Peachford Hospital in Atlanta, and decided to procure his services again.

Dr. Harris met with Bennett several times after his arrest and came to the conclusion that Bennett was legally insane when he killed his wife. His diagnosis: Bennett was suffering from a temporary psychotic episode.

Dr. Harris informed defense counsel of his diagnosis and added that numerous stress factors led to Bennett's mental breakdown. Dr. Harris also told counsel that Zantac, a medication which had been prescribed for Bennett, was an "important" contributing factor.[1]

Defense counsel met with Dr. Harris several times. The last meeting took place nine months before trial. Although other meetings were arranged before the trial began, Dr. Harris begged off.

Defense counsel spoke with Dr. Harris by telephone three months before trial. And they had a brief telephone conversation with him the day before he was to testify. They thought his testimony was a "done deal."

On the day he testified, a Friday, Dr. Harris arrived in the courtroom looking "deathly ill." He was accompanied by a companion who had driven him and assisted him in moving about.

Dr. Harris was to testify in the afternoon as Bennett's last witness. Before testifying, Dr. Harris rested on a couch in defense counsel's office for three hours, but his condition did not improve. When defense counsel suggested they should seek a continuance until Monday, Dr. Harris balked and said he would "withdraw" if he did not testify that afternoon. But he assured defense counsel he was prepared and able to testify.

Defense counsel called Dr. Harris to the witness stand. He was far from the expert witness that defense counsel had known him to be. His clothes were disheveled; he was unkempt and sloppy. His testimony was the worst defense counsel had ever seen: He confused names and appeared to be irrational; his voice fluctuated inappropriately; and his facial expressions were "cartoonish."

Dr. Harris did testify on direct examination that, at the time in question, Bennett had had a temporary psychotic episode and that he

---

[1] That there is a link between Zantac and psychosis (in a small percentage of patients) is well documented in the medical literature.

did not know right from wrong. But he "stunned" defense counsel when he "pooh poohed" the notion that Zantac was an important contributing factor in Bennett's psychosis.[2]

On cross-examination, Dr. Harris did even more damage to the defense. His response to several questions was to sit speechless, and he was distracted by crime scene photos. He continued to be confused and rambling.[3] When the prosecutor asked Dr. Harris what he would do for Bennett to prevent him from killing again, he replied, "I'd give him Tylenol as needed for his headache and I'd tell him to take — to stay on Zantac for his hiatal hernia . . . [and] I'd send him home with follow-up care." This evoked laughter in the courtroom and the jury box.

Dr. Harris volunteered additional damaging testimony *after* the prosecutor finished cross-examining him. The colloquy went as follows:

> Prosecutor: Thank you Dr. Harris.
> Dr. Harris: Would it be appropriate for me to make one more comment?
> Prosecutor: . . . If you want to volunteer something, tell the jury whatever you want them to hear; I'm sure they'll listen.
> Dr. Harris: This [pointing at a crime scene photograph] looks like the work of a vicious maniac.
> Prosecutor: Thank you Doctor. You know who did that, don't you, Dr. Harris?
> Dr. Harris: Mr. Bennett.

After Dr. Harris testified, Krontz turned to Bennett and apologized to him. He believed that Dr. Harris had "gutted" the insanity defense and destroyed the credibility of the entire defense team. Accordingly, although Dr. Harris' "expert" testimony was to be the lynchpin of Bennett's insanity defense, defense counsel made no reference to it in closing argument.

When defense counsel returned to their office they learned, through Dr. Harris' companion, that Dr. Harris was suffering from AIDS. It was at that point that they realized Dr. Harris had deceived them with regard to his ability to testify on Bennett's behalf.

Defense counsel put forth no mitigating psychiatric evidence during the penalty phase of the trial. And, although they had

---

[2] Defense counsel believed the Zantac issue was critical to the insanity defense because they thought the jury would want to know how Bennett's mental condition could have deteriorated so suddenly.

[3] In closing argument, the prosecution referred to Dr. Harris's testimony as follows: "Poor Dr. Boaz Harris tried to mumble through some things . . . I don't know what [he] ended up saying."

requested a charge on Bennett's lack of future dangerousness, they introduced no evidence along those lines because they feared calling Dr. Harris back to the stand. Accordingly, the trial court refused to give a lack of future dangerousness charge.

Defense counsel subsequently learned that, at the time of trial, Dr. Harris had AIDS dementia. In fact, his illness had become so severe that he had closed his office shortly before the trial, and he died six months later. The cause of death was viral encephalopathy.

Bennett filed a habeas corpus petition in which he alleged that he was denied his right to effective assistance of a mental health expert, as well as his right to effective assistance of counsel. At the hearing, Bennett presented the testimony of Krontz and McLeod, as well as Dr. Charles Barnett Nemeroff, the chairman of the Department of Psychiatry at Emory University Medical School. Dr. Nemeroff testified that, at the time of the murder, Bennett suffered a brief reactive psychosis, and, possibly, an acute delusional paranoid disorder; that Zantac was one of a number of factors which could have contributed to Bennett's breakdown; and that it was unlikely that the murder was the result of a jealous rage. He also testified that Dr. Harris' performance at trial was "not in any way, shape or form competent."

The habeas corpus court found that Bennett was deprived of his due process right to a fair trial because the testimony of his psychiatric expert completely undermined his insanity defense. Accordingly, the habeas corpus court granted Bennett's petition, overturned his conviction and death sentence, and ordered a new trial. In passing, the habeas corpus court came to the conclusion that defense counsel could not be faulted for putting Dr. Harris on the witness stand without interviewing him.

The State appeals in Case No. S98A1993. Bennett cross-appeals in Case No. S98X1995, asserting, primarily, that the habeas corpus court erred in failing to find ineffectiveness of trial counsel.

### The Main Appeal

1. The due process clause ensures that a defendant will be given access to a competent psychiatrist when the defendant's mental state is in issue. *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985). But this is not to say that a defendant is entitled to the effective assistance of a psychiatrist in addition to the effective assistance of counsel. On the contrary, a defendant has no right to the effective assistance of a psychiatrist, or any other expert. *Waye v. Murray*, 884 F2d 765 (4th Cir. 1989) (per curiam).

In *Waye*, the defendant claimed that his psychiatrist was ineffective because he failed to emphasize the defendant's diminished

capacity in his trial testimony. The court rejected that claim and observed:

> [i]t will nearly always be possible in cases involving the basic human emotions to find one expert witness who disagrees with another and to procure an affidavit to that effect from the second prospective witness. To inaugurate a constitutional or procedural rule of an ineffective expert witness in lieu of the constitutional standard of an ineffective attorney, we think, is going further than the federal procedural demands of a fair trial and the constitution require.

Id. at 767. Other courts which have considered this issue are in agreement with *Waye*. See, e.g., *Wilson v. Greene*, 155 F3d 396, 401 (4th Cir. 1998) (defendant not entitled to effective assistance of expert); *Harris v. Vasquez*, 949 F2d 1497, 1517-1518 (9th Cir. 1990) (to allow psychiatrists to debate psychiatric testimony on a collateral challenge to a death sentence would place federal courts in a psycho-legal quagmire and result in abuse of the habeas process); *Silagy v. Peters*, 905 F2d 986, 1013 (7th Cir. 1990) (courts should be reluctant to entertain battle of the experts in a "competence" review); *People v. Samayoa*, 938 P2d 2, 31 (Cal. 1997) (no right to effective assistance of psychologist).

In this case, the habeas corpus court granted Bennett's petition, ruling that Dr. Harris' testimony was ineffective and deprived Bennett of a fair trial. The essence of that ruling was to award habeas corpus relief on the basis of ineffective assistance of an expert witness. In so doing, the habeas corpus court erred. *Waye v. Murray*, supra.

### The Cross-Appeal

2. Although a defendant is not entitled to effective assistance of an expert witness, he is not without a remedy when an expert witness is ineffective. As the court observed in *Poyner v. Murray*, 964 F2d 1404, 1419 (4th Cir. 1992):

> That there is no separately-cognizable claim of ineffective assistance of expert witnesses does not mean that a substandard performance by a psychiatrist at trial could never form the basis for habeas corpus relief. However, the constitutionally deficient performance must be that of counsel, in obtaining the psychiatric examinations or presenting the evidence at trial, for example.

Thus, we must examine Dr. Harris' psychiatric assistance within an

ineffective assistance of counsel framework. See *Alley v. State*, 882 SW2d 810, 817-818 (Tenn. Cr. App. 1994) (although performance of expert witness does not afford basis for post-conviction relief, evidence concerning performance of expert witness is relevant to establish ineffective assistance of counsel).

Appellate courts apply a two-pronged test to determine if counsel's performance was ineffective as to require the reversal of a conviction or a death sentence:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U. S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984).

Bennett claimed that the performance of defense counsel was deficient with regard to Dr. Harris' performance for a number of reasons, including the failure to (1) interview Dr. Harris and ascertain his mental fitness before putting him on the stand, (2) alert the trial court that Dr. Harris was incompetent, (3) request a continuance of the guilt-innocence phase of the trial to secure other psychiatric expert assistance, and (4) request a continuance of the sentencing phase of the trial for the same purpose. Perhaps because the habeas corpus court vacated Bennett's conviction and sentence, it saw no need to consider each and every one of Bennett's claims that counsel were ineffective in presenting Dr. Harris' testimony. However, as noted above, it did address Bennett's first claim, finding that defense counsel were not ineffective for having failed to interview Dr. Harris before he testified. In this regard, the habeas corpus court determined that defense counsel reasonably believed Dr. Harris' testimony was set on the basis of the telephone conversation with Dr. Harris three months before trial, and Dr. Harris' assurances at the time of trial that he was prepared. Defense counsel could not be faulted, the habeas corpus court reasoned, for having been deceived by Dr. Harris. Bennett asserts that that ruling was erroneous. We cannot agree.

The reasonableness of counsel's conduct must be viewed at the time of trial and under the circumstances of the case. *Berry v. State*,

267 Ga. 476, 479 (4) (480 SE2d 32) (1997). Hindsight is irrelevant in determining whether counsel acted reasonably. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985). Moreover, there is a "strong presumption" that "counsel's conduct falls within the wide range of reasonable professional conduct and that all significant decisions were made in the exercise of reasonable professional judgment." Id.

Defense counsel needed Dr. Harris' testimony to present their defense. They had spoken to him on the telephone only three months before, and he assured them before he was to testify that he was prepared and capable. Judging counsel's performance under the circumstances which confronted them, and giving deference to the "strong presumption" that counsel were effective, we believe the evidence supports the conclusion that defense counsel acted reasonably when they put Dr. Harris on the witness stand without interviewing him further. See *Henry v. State*, 269 Ga. 851, 855 (5) (507 SE2d 419) (1998) (counsel did not inadequately prepare psychologist who gave expert testimony in mitigation).

This is not to say, however, that defense counsel acted reasonably in failing to seek a continuance once Dr. Harris began testifying. After all, at that point, it became apparent that, despite his previous assurances, Dr. Harris was manifestly incapable of assisting the defense. As the Eleventh Circuit Court of Appeals observed in *Clisby v. Jones*, 960 F2d 925, 934, fn. 12 (11th Cir. 1992),

> [W]e have difficulty envisioning a case in which counsel's failure to alert the trial court to the manifest inadequacy of an expert's psychiatric assistance would not violate the defendant's right to effective assistance of counsel under the Sixth Amendment.

Accordingly, we remand this case to the habeas corpus court to determine whether defense counsel were ineffective in presenting Dr. Harris' testimony once it became apparent that he was incompetent, in failing to seek a continuance to procure the assistance of another expert for the remainder of the guilt/innocence and the penalty phases of the trial, and any other claims asserted but not considered.[4]

3. This Court will not reverse a trial court's decision on discovery matters in the absence of a clear abuse of discretion. *Woelper v. Piedmont Cotton Mills*, 266 Ga. 472, 473 (1) (467 SE2d 517) (1996). We find no clear abuse of discretion in the habeas corpus court's refusal to permit the discovery of Dr. Harris' medical records.

---

[4] Bennett also asserted ineffective assistance of counsel claims which were unrelated to Dr. Harris' testimony. The habeas corpus court did not address these claims.

*Judgment reversed in Case No. S98A1993 and case remanded in Case No. S98X1995. All the Justices concur.*

DECIDED MARCH 1, 1998.

*David McDade, District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Christopher L. Phillips, Assistant Attorney General,* for appellant.

*King & Spalding, Stephen S. Cowen, Douglas W. Gilfillan, James W. Boswell III, Michael M. Raiber,* for appellee.